# EXHIBIT 2

FILED
MARY L. SWAIN
BUTLER COUNTY
CLERK OF COURTS
12/29/2022 04:04 PM
CV 2022 12 2140

**IN THE COURT OF COMMON PLEAS**
**BUTLER COUNTY, OHIO**

| | | |
|---|---|---|
| **CALVARY INDUSTRIES, INC.** | : | Case No.: |
| 9233 Seward Road | : | |
| Fairfield, OH 45014 | : | Judge: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **VERIFIED COMPLAINT FOR** |
| | : | **TEMPORARY, PRELIMINARY** |
| **JONATHAN K. WINTERS** | : | **AND PERMANENT INJUNCTIVE** |
| 21 South Monroe Street | : | **RELIEF AND DAMAGES** |
| Troy, OH 45373 | : | |
| | : | **(With Jury Demand Endorsed** |
| and | : | **Hereon)** |
| | : | |
| **JIM EPSTEIN** | : | **Exhibit A Attached** |
| 701 Long Beach Lane, | : | |
| Michigan City, IN 46360 | : | |
| | : | |
| and | : | |
| | : | |
| **EVAN EPSTEIN** | : | |
| 2300 Sherbrooke Lane | : | |
| McKinney, TX 75070 | : | |
| | : | |
| | : | |
| and | : | |
| | : | |
| **THOR CUSTOM STEEL COATINGS,** | : | |
| **LLC** | : | |
| 3609 East U.S. Highway 12 | : | |
| Michigan City, IN 46360 | : | |
| | : | |
| Defendants. | : | |
| | : | |
| Also Serve its Registered Agent: | : | |
| Legal Inc. Corporate Services, Inc. | : | |
| 8520 Allison Pointe Boulevard | : | |
| Suite 220 #122 | : | |
| Indianapolis, IN 46250 | : | |
| | : | |

Plaintiff Cavalry Industries, Inc. ("Plaintiff" or "Cavalry") for its Complaint for Preliminary and Permanent Injunctive Relief and Damages against Defendants Jonathan K. Winters ("Winters"), Evan Epstein, Jim Epstein and Thor Custom Steel Coatings, LLC ("Thor"), alleges as follows:

## PARTIES

1.      Calvary is an Ohio corporation with its principal place of business at 9233 Seward Road, Fairfield, OH 45014.  Calvary formulates and produces blended process chemicals, such as industrial coatings, cleaners and metalworking fluids for clients across a broad range of industries throughout North America.

2.      Defendant Winters resides at 21 South Monroe Street, Troy, OH  45373.  He formerly worked for Calvary as a Product Developer and Technical Representative.  He is a member of Thor.

3.      Defendant Jim Epstein resides at 701 Long Beach Lane, Michigan City, IN 46360. He works in the home repair and remodeling business and has no experience with industrial chemicals.  Jim Epstein is a member of Thor.

4.      Defendant Evan Epstein resides at 2300 Sherbrooke Lane, McKinney, Texas 75070.  His professional experience involves working in sales for a building materials supply company and an auto dealer financing company. He has no experience with developing industrial chemicals.  Evan Epstein is a member of Thor.

5.      Defendant Thor is an Indiana limited liability company.  According to the Indiana Secretary of State's records, its principal office is located in Michigan City, Indiana.

## JURISDICTION AND VENUE

6.      Personal jurisdiction and venue are proper over Winters because he consented and agreed to jurisdiction in courts located in Butler and Hamilton Counties for any actions to enforce

2

his Agent Agreement with Calvary. A true and accurate copy of this Agent Agreement is attached as Exhibit A.

7.      Personal jurisdiction and venue are proper over Evan Epstein and Jim Epstein because they conduct business in Ohio, met with Calvary in Ohio, entered into an agreement with Calvary in Ohio, and caused injury to Calvary in Ohio through their actions of misappropriating and utilizing confidential and trade secret information belonging to Calvary and that Calvary developed in Ohio.

8.      Personal jurisdiction and venue also are proper over Winters because he caused injury to Calvary in Ohio through his actions of misappropriating and utilizing confidential and trade secret information belonging to Calvary and that Calvary developed in Ohio.

9.      Personal jurisdiction and venue are proper over Thor because it conducts business in Ohio and because it has conspired with Winters to misappropriate and utilize confidential and trade secret information belonging to Calvary and that Calvary developed in Ohio.

## FACTUAL ALLEGATIONS

10.     Calvary is a second-generation, family-owned, Butler County, Ohio company that employs teams of chemical engineers, experienced production employees and quality control experts to provide advanced chemical solutions and production capabilities to a broad range of industries.

11.     Through its high-tech laboratory and production facilities, in which it has invested millions of dollars, Calvary has formulated over 2,500 custom chemical solutions that it supplies to a variety of industrial end users, including automotive manufacturers, food and beverage companies, metal fabricators, paper and pulp producers and many others. Confidential and proprietary information about its chemical solutions and production methods is at the heart of

Calvary's business.

12.     Calvary spends substantial resources, both human and financial, on the research and development of unique, proprietary, and trade secret chemical compounds for industrial applications. Its chemical formulas, processes and production methods, along with information such as its suppliers, overhead, and pricing, are replete with trade secret information. This trade secret information provides it with a competitive advantage in the marketplace.

13.     Calvary exercises great care in protecting its trade secrets and guarding against disclosure of confidential information. For example, it keeps all of its proprietary chemical formulas in a formulary database on its computer server, where each chemical product that it produces is searchable by product code. For each product, the formulary database contains the identity of all of the chemical components by weight and physical properties, as well as records of testing and validation information. The formulary database is password protected and only Calvary's President, Austin Morelock, Calvary's Vice President and Director of Product Development, Chris Berger, a handful of chemical engineers, and a production manager have access to the password. Calvary also maintains a confidential, secure computer network that requires all employees to authenticate their usage of the network with a username and confidential password. Further still, Calvary utilizes confidentiality agreements and non-competition agreements with employees who have access to the formulary database and other confidential information.

14.     In approximately the early spring of 2018, Winters and Mr. Berger began having conversations about an idea that Winters had for a ceramic coating that he believed would prevent steel from oxidizing during the hot stamping process used in manufacturing steel parts for automobiles. At the time, Winters did not have a formula, or any samples of this proposed

4

coating. In fact, Winters was not able to show Mr. Berger anything that he had ever written down about this idea. Rather, it was merely a concept that he and Mr. Berger discussed orally. To Mr. Berger's knowledge, Winters had never actually validated, or even tested, any formula for this coating idea. Nevertheless, Calvary was intrigued because it believed that the concept could have significant industrial applications.

15.     Calvary decided to take a chance on Winters' and the concept of a new coating technology. So, on or about October 9, 2018, it hired Winters as a Product Developer and Technical Representative.

16.     Winters and Calvary agreed that he would perform two primary roles at Calvary: the first was to work with Calvary's chemical engineers, using Calvary's laboratory and equipment, as well as new equipment in which Calvary would invest, to help develop the concept of a new ceramic coating that would prevent steel from oxidizing during the hot stamping process; and the second was to generate sales of this coating technology and other of Calvary's chemicals to customers.

17.     To effectuate this relationship, the parties entered into an Agent Agreement, a copy of which is attached hereto as Exhibit A (the "Agent Agreement"). Under the Agent Agreement, Calvary agreed that, for the first two years of the relationship, Winters would receive a 50% share of the Gross Profits from products that he helped develop and sell, with that percentage reduced to 31% after two years. The Agent Agreement also permitted Calvary to pay Winters a draw against future Gross Profits, although it did not require it.

18.     The Agent Agreement specifically provided that, while Winters would be entitled to a significant share of the Gross Profits from the coating technology (if it indeed could be successfully developed), the technology itself, as well as any and all other intellectual property

5

developed during Winters relationship with Calvary would belong to Calvary. Specifically, the Agreement provided as follows:

1. **Confidential Information.** <u>You do not acquire any right, title, or interest in or the use of Confidential Information in any manner whatsoever.</u> You shall not, by yourself or through another person or through another entity during or after your Agent employment by Cavalry, disclose to others, or use, except for Cavalry's benefit, any Confidential Information. Confidential Information means, but is not limited to, any reports, data, charts, graphs, production records, summaries, recommendation, drawings, software or specifications, inventions, trade secrets, discoveries, improvements, marketing plans, business strategies, sales and service manuals, research and technology developments, machines, devices, processes, products, designs, mixtures and/or compounds, whether patentable or not, that may have been, or are now, or <u>may hereafter be made</u>, used, devised, considered or investigated by or for Calvary or Third Parties….

2. **Non-Disclosure and Limited Use**. You will at all times keep secret and hold inviolate Confidential Information…. You shall not disclose any identity or correlation between matters publicly known and Cavalry's Confidential Information. Further, you shall not, without written consent of Calvary:

a) provide unauthorized disclosure to others…;

b) use the Confidential Information for your own benefit or the benefit of others, in any manner detrimental to Calvary, or otherwise than for its intended use, or disclose to others that the Confidential Information is known to or used by the Recipient;

c) make any unauthorized copies or retain any work product or document relating to or in any manner based on Calvary's <u>Confidential Information</u> (and you shall turn over all such work product to Calvary upon termination of this Agreement, your Agent status, completion of services or demand by Calvary, whichever first occurs).

…

5. **Employment and Post-Agent Restrictions.**
During and for eighteen (18) months immediately following the termination of your Agent status, you will not, by yourself or through another person or through another entity:

a) Solicit, offer to sell, or sell any products or provide any services, which compete with or displace Calvary's products or services to those

6

customers who were provided Calvary products or services at any time during the (18) months preceding termination of your employment at Calvary or its affiliates and;

b) Solicit, support, offer to sell, or sell any products or displace Calvary's products or services to those customers and their branches, plants and offices, which you called on, supported, contacted, were introduced to, or performed services for eighteen (18) months preceding the termination of your Agent Status with Calvary or its affiliates;
…

19. After Winters and Calvary entered into the Agent Agreement in October of 2018, Calvary invested thousands of dollars in new equipment and supplies, and it devoted its other resources, including existing equipment and personnel, towards developing the coating technology.

20. Winters, however, was not an industrious worker. While it is true that he performed some work towards developing the formula for the coating technology, the vast majority of the work was performed by Mr. Berger, who is an accomplished chemist with approximately 23 years of experience in researching, developing and producing custom chemicals. At most, Winters showed up to work at Calvary's facilities approximately five days per month since the time he entered into the Agent Agreement.

21. On the roughly 5 days per month that Winters bothered to show up to Calvary's facilities, Mr. Berger would cease work on other projects to work side by side with Winters to continue to develop the coating technology.

22. Other than the limited time he spent working with Mr. Berger on the coating technology, Winters also worked on a few other unrelated chemical formulas.

23. Prior to joining Calvary, Winters had communications with representatives from Nucor Steel, a large multinational steel producer, about the concept of a ceramic coating technology. While Nucor was interested in the concept, Winters had no means of developing it,

7

much less testing and validating it, prior to joining Calvary.

24.     As months went by after he entered into the Agent Agreement, Winters' half-hearted efforts at Calvary dwindled even further.

25.     By the spring of 2020, Winters was performing only limited work for Calvary; so, as permitted by the Agent Agreement, Calvary ceased paying Winters draws against future sales and instead paid him the agreed upon Gross Profits that were generated from the other products he worked on and sold.  Winters also developed two water-based paints for use on furniture parts, and Calvary paid him on the gross profits earned from the sale of that paint. However, while Winters largely ceased working, the Agent Agreement otherwise renewed in full force and effect.

26.     In the months thereafter, Mr. Berger continued to work on and make key revisions to the formula for the coating technology and the process for producing it.

27.     On information and belief, in approximately the summer or fall of 2020, Winters, having ceased collecting draws from Calvary, approached Jim Epstein about working with him on the coating technology that he had been working on for Cavalry.

28.     On information and belief, Winters knew Jim Epstein because he was or is the long-term boyfriend of Winters' ex-wife.

29.     Jim Epstein is in the home repair and remodeling business and has no relevant chemistry experience whatsoever.

30.     On information and belief, Winters communicated with Jim Epstein and his nephew, Evan Epstein about the coating technology, including the developments that Calvary had made on the technology.

31.     Winters' communications with the Epsteins about the developments of the coating technology at Calvary were without Cavalry's knowledge or consent, and in violation of the

8

Agent Agreement.

32.     Like his uncle Jim, Evan Epstein has no experience with industrial chemicals.  His professional background is in working in sales for a building materials supply company and an auto dealer financing company.  He also works with Jim Epstein in the home remodeling business.

33.     None of Jim Epstein, Evan Epstein, or Winters had the equipment or facilities to develop chemical compounds such as the coating technology.

34.     In approximately the fall of 2020, Jim Epstein called Mr. Berger and informed him that he was working with Winters on the ceramic coating technology, and asked about partnering with Calvary to develop and produce it.  Mr. Epstein further represented to Mr. Berger that he and Winters had made significant inroads with Nucor Steel, who was very interested in the technology.

35.     Calvary was dismayed that Winters had communicated about the coating technology to third parties in violation of the Agent Agreement.  That said, it remained interested in working with Winters because of his connections at Nucor Steel.

36.     On December 30, 2020, Jim Epstein, Evan Epstein, and Winters formed Defendant Thor as an Indiana limited liability company.  Other than the Epsteins and Winters, Thor had no employees, no laboratory and no equipment.  Stated otherwise, none of the Defendants had any ability to develop, produce, test, or validate a coating technology.

37.     In the ensuing weeks, the Epsteins and Calvary had numerous discussions about whether they could work together to further develop the coating technology and the prospects of selling or licensing it to Nucor Steel.

38.     To the extent that Calvary was interested in working with Defendants, it was because (i) although Calvary had made significant progress in creating, developing and testing

9

the coating technology, it still needed more work; and (ii) it seemed that Thor had made inroads with decisionmakers at Nucor. Ultimately, the parties reached an agreement whereby Thor and Calvary would operate as a joint venture sharing equally in all of the costs and expenses of developing the coating technology, and also share equally in any profits from it. (This agreement is hereinafter referred to as the "Joint Venture Agreement"). This 50-50 split resembled the profit-sharing approach that Calvary had originally agreed to with Winters in the Agent Agreement.

39.     On or about May 13, 2021, Jim Epstein and Evan Epstein met in-person with Austin Morelock and Calvary's former President, Ivan Byers, at Calvary's offices in Fairfield, Ohio. At this meeting, the parties further discussed their Joint Venture Agreement and confirmed that, under it, they would work together to develop and sell the coating technology, splitting all costs and profits equally. The parties discussed the further steps, such as testing and validation, that were necessary to make the Joint Venture Agreement successful.

40.     By August of 2021, Calvary, without any meaningful input from Winters or Thor, further developed the coating technology and made additional revisions to the formula. These revisions resulted in the development of a coating technology that successfully adhered to steel and prevented it from oxidizing during the temperature extremes involved in the hot stamping process. The coating technology was unique among other steel coating technologies in the market in that it was less expensive to produce and could be more easily applied to steel.

41.     In approximately early August of 2021, Calvary provided samples of the coating technology to Nucor Steel for testing on its steel coils. The coating technology, however, failed to cure properly and also failed to adhere to the steel coils.

42.     Following these failures, on or about August 9, 2021, Jim Epstein forwarded to Mr. Berger an email in which a representative from a raw materials supplier recommended a

10

curing agent to fix the curing problem.  Jim Epstein shipped a sample of the curing agent to Calvary and asked Mr. Berger to "add at 0.1% coating solids," a recommendation he received from the raw materials supplier.  Mr. Berger added the curing agent at this ratio, but it failed to solve the problem.  Mr. Berger then made several additional samples of the coating at various ratios and, through trial and error, ultimately determined the ratio of curing agent to the formula to produce a coating that would cure properly.

43.     In the days that followed, Mr. Berger, on his own, made further modifications to the chemical formula of the coating technology to correct the adhesion issue and tested them. After multiple attempted modifications, Mr. Berger was able to create a formula that both successfully adhered to the steel and withstood testing under extremely high temperatures.  This was a significant breakthrough – it was the first time that anyone had created and successfully tested a ceramic coating technology of this nature.

44.     Mr. Berger notified Nucor Steel about the breakthrough and sent Nucor's Chief Research and Development Officer a power point presentation of what he had accomplished.

45.     Based on this information, Nucor Steel requested that Calvary produce a drum of the coating technology for testing to be held on September 1, 2021.

46.     On September 1, 2021, Mr. Berger and Winters attended Nucor Steel's test of the coating technology that had been newly formulated by Mr. Berger.  To the delight of everyone present, it successfully adhered to steel coils and withstood the extreme temperatures encountered in the hot stamping process.

47.     For several weeks prior to this successful test of the Cavalry Coating Technology, Thor had promised to prepare a more formal written agreement memorializing the Joint Venture Agreement between Thor and Cavalry.

48. On October 20, 2021, Evan Epstein finally sent a draft written agreement to Cavalry's President, Austin Morelock, with terms that did not reflect the 50-50 Joint Venture Agreement. Specifically, Evan Epstein's draft agreement misrepresented Thor as the sole owner of the coating technology and purported to relegate Cavalry to the role of a supplier.

49. Mr. Morelock was incredulous. The next day, on October 21, 2021, he emailed Mr. Epstein and explained that the draft agreement was unacceptable because it failed to accurately reflect the parties' Joint Venture Agreement. Mr. Morelock further explained the reality that it was Cavalry, not Thor, who had been chiefly responsible for developing the coating technology since October of 2018. Quoting Mr. Morelock:

> Our signed agreement with John Winters states that the technology is owned by Calvary. As you know this agreement was signed before any and all agreements you executed with Winters. This gives me heart burn [because] we invested over six figures in upfront costs to develop the product that you're claiming ownership of. This product was 95%+ complete before you knew anything about it. Calvary personnel, raw materials, equipment, etc. was used to create this product and no one else put forth any investment to create the product.
> …
>
> Ultimately, Calvary's value was/is co-developing this product with Winters, running over 12 months of testing and validation, establishing a relationship with the sole supplier, working with Nucor, etc. Thor's value was stepping in and continuing a project with Nucor that Calvary initiated. If an outsider were to read this agreement, he or she would think it was the other way around.

50. Evan Epstein immediately responded to Mr. Morelock's email by text message and conceded that he was correct on all points. Mr. Epstein wrote:

> Just got your email. All fair points. I apologize, it wasn't my intention to put something in front of you that we didn't agree upon. Let me get with Bob and adjust. Some of the points were just standard language (term) so I will have something updated in front of you ASAP.

51. Mr. Morelock was satisfied with this response at the time. Little could he know

that, despite his promises (and his admissions), Evan Epstein would never provide Mr. Morelock with a revised written agreement.

52. On information and belief, in the days that followed, Evan Epstein and/or Jim Epstein asked Winters to obtain the revised formula for the coating technology that Mr. Berger had developed so that they could claim ownership of it and deprive Calvary of its intellectual property.

53. Indeed, in the days that followed Defendants' effort to change the terms of the Joint Venture Agreement with its draft agreement, Winters made repeated requests of Mr. Berger to provide him with the revised formula that Mr. Berger had successfully developed. Mr. Winters had to make these requests because he did not know the successful formula and had played no part in the work involved in formulating or testing the revisions.

54. In the months that followed, Nucor Steel provided the steel coil that had successfully been coated with the coating technology to Ford Motor Company for its own testing for hot stamping, welding, paintability and corrosion resistance.

55. Ford's testing of the coating technology that had been reformulated by Mr. Berger proved to be successful. Ford and Nucor then scheduled a final test of the coating technology for November 21, 2022 and asked Calvary to supply a barrel of the reformulated coating technology for that purpose.

56. In recent months, Calvary continued to operate under the Joint Venture agreement, and Defendants led Calvary to believe they were operating under the Joint Venture Agreement as well. Calvary also continued to press Thor and the Epsteins for a written agreement memorializing the Joint Venture Agreement. As time passed, it became increasingly concerned that Defendants wanted to claim Calvary's intellectual property for themselves and cut Calvary

13

out of the deal.

57.     On or about September 19, 2022, Calvary learned that, on February 23, 2021, Thor had filed a provisional patent application for a coating technology that incorporated confidential and trade secret information developed by Calvary under the Agent Agreement. This provisional patent falsely listed Winters as the sole inventor. The truth was that the coating technology identified in Thor's provisional patent application was actually developed at Calvary. It also is worth noting that the formula described in Thor's provisional patent is materially different from the formula for the coating technology that Calvary produced and that was successfully tested on Nucor Steel's coil.

58.     In a final effort to memorialize the Joint Venture Agreement, Defendants, Mr. Morelock and Mr. Berger met with Evan Epstein and Jim Epstein in Dallas, Texas on October 20, 2022. Also present was an attorney who, on information and belief, represents private equity interests who had invested in, or were considering investing in, Thor. At this meeting, it became clear that Defendants intended to breach the Joint Venture Agreement. Among other things, they expressed their intent to claim Calvary's intellectual property as their own, and suggested that Calvary should be entitled to 10% of the profits from the coating technology instead of the 50% to which Thor (and previously Winters) had agreed.

59.     On information and belief, Defendants are continuing to attempt to contract with Nucor and/or Ford to sell or license the confidential, trade secret technology that was developed by Cavalry.

## COUNT I

**(Breach of Contract – Injunctive Relief)**
**Calvary vs. Winters**

60.     Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

61.    The "Confidential Information" and "Non-Disclosure and Limited Use" and "Post-Agent Restrictions" provisions contained in the Agent Agreement and described herein are reasonable and necessary to protect Calvary's legitimate business interests, including, but not limited to, the chemical formulas and processes that Calvary expended significant resources to develop during the period that it was engaged with Winters under the Agent Agreement.

62.    Calvary lived up to all of its contractual obligations in the Agent Agreement.

63.    Winters breached the Confidential Information, Non-Disclosure and Limited Use, and Post-Agent Restrictions of the Agent Agreement by, among other things, (i) using and disclosing Calvary's confidential, trade secret information to the Epsteins and Thor, and (ii) contracting with the Epsteins and Thor for the purpose of further developing, marketing and selling Calvary's confidential and trade secret information to Calvary's customers or prospective customers, including Nucor Steel.

64.    Unless Winters is enjoined from further violating the provisions of the Agent Agreement, Calvary will be irreparably harmed by the disclosure and use of its chemical formulas, including the formulas comprising the coating technology, which are confidential and trade secret information and solely the property of Calvary.  Calvary further will be harmed by the loss of confidence and trust of its customers, the loss of good will, and the loss of its business reputation. Finally, unless Winters is enjoined from further violating the provisions of the Agent Agreement, Calvary will suffer present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

65.    Calvary has no adequate remedy at law.

## COUNT II

**(Breach of Contract -- Damages)**
**Calvary vs. Winters**

66.     Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

67.     Calvary lived up to all of its contractual obligations in the Agent Agreement.

68.     Winters has violated and is continuing to violate the Confidential Information, Non-Disclosure and Limited Use, and Post-Agent Restrictions of the Agreement as described above.

69.     As a direct and proximate result of Winters' unlawful conduct and breach of the Agent Agreement, he is liable to Calvary in an amount to be determined at trial.

## COUNT III

**(Misappropriation of Trade Secrets in Violation of O.R.C. § 1333.61 – Injunctive Relief)**
**Calvary vs. All Defendants**

70.     Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

71.     In connection with its business, Calvary has expended substantial resources in the form of capital expenditures, time, labor and other financial resources on the research and development of confidential, trade secret information, including, but not limited to, the chemical formulas and processes used in developing the coating technology.

72.     Calvary has taken substantial measures and exercised due diligence to prevent its confidential, trade secret information, including its chemical formulas and processes, from becoming available to persons other than those selected by it to have access to this information in order to further its business.

73.     In furtherance of the Agent Agreement, Winters was provided access to confidential and trade secret information belonging to Calvary. Further, he worked with Calvary

16

on developing confidential and trade secret information that, pursuant to the Agent Agreement, was the property of Calvary, including but not limited to Calvary's chemical formulas and processes used to develop the coating technology.

74. In furtherance of the Joint Venture Agreement, all Defendants were provided access to confidential and trade secret information belonging to Calvary, including but not limited to Calvary's chemical formulas and processes used to develop the coating technology.

75. Defendants have used, or inevitably will use, Calvary's trade secret information to enhance their own business and interests to the exclusion of Calvary, and for the purpose of unfairly competing against Calvary.

76. Calvary has at all times had a protectable business interest in its trade secret information and has taken reasonable steps to protect the secrecy of this information.

77. Defendants have misappropriated Calvary's trade secrets knowingly, willfully, maliciously, intentionally and in bad faith.

78. Defendants' misappropriation of Calvary's trade secrets has and will proximately cause substantial damage to Calvary, including, but not limited to, loss of good will, unjust enrichment, incalculable lost revenues and profits.

79. Calvary is entitled to preliminary and permanent injunctions against the use, possession, transfer, duplication and disclosure by Defendants of such proprietary and trade secret information, and against any future development or activities that would or could make use of such proprietary and trade secret information.

80. Unless Defendants are preliminarily and permanently enjoined from misusing, converting, disclosing, and misappropriating Calvary's proprietary and trade secret information, and from unfairly competing against it, Calvary will be irreparably harmed by the disclosure and

use of its chemical formulas, including the formulas comprising the coating technology, which are confidential and trade secret information and solely the property of Calvary. Calvary further will be harmed by the loss of confidence and trust of its customers, the loss of good will, and the loss of its business reputation. Finally, unless Defendants are enjoined, Calvary will suffer present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

81. Calvary has no adequate remedy at law.

## COUNT IV

**(Misappropriation of Trade Secrets – in Violation of O.R.C. § 1333.61 – Damages)**
**Calvary vs. All Defendants**

82. Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

83. In connection with its business, Calvary has expended substantial resources in the form of capital expenditures, time, labor and other financial resources on the research and development of confidential, trade secret information, including, but not limited to, the chemical formulas and processes used in developing the coating technology.

84. Defendants misappropriated Calvary's trade secrets as described above knowingly, willfully , maliciously, intentionally and in bad faith as to warrant the imposition of punitive damages and attorneys' fees in an amount to be determined at trial.

85. As a direct and proximate result of Defendants' unlawful conduct, he is liable to Calvary in an amount to be determined at trial.

## COUNT V

**(Tortious Interference with Contract – Injunctive Relief)**
**Calvary vs. Jim Epstein, Evan Epstein and Thor**

86. Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

87. The Epsteins and Thor were aware that Winters was subject to the Agent Agreement when they began working with him in an effort: (i) to make use of the coating technology that was the subject of the Agreement's "Confidential Information" and "Non-Disclosure and Limited Use" provisions, and (ii) to help Winters compete against Calvary in violation of the Agreement's "Post-Agent Restrictions."

88. The Epsteins and Thor are continuing to interfere with the Agreement by working with Winters to make use of Calvary's confidential and trade secret information and unfairly compete against it despite this knowledge.

89. The Epsteins and Thor intentionally interfered, and continue to interfere, with Calvary's Agreement with Winters for their own benefit.

90. The Epsteins and Thor have interfered, and continue to interfere, with Calvary's Agreement with Winters without privilege to do so.

91. Unless the Epsteins and Thor are enjoined from further aiding Winters in violating the Agreement, Calvary will be harmed by the further disclosure and use of its chemical formulas, including the formulas comprising the coating technology, which are confidential and trade secret information and solely the property of Calvary. Calvary further will be harmed by the loss of confidence and trust of its customers, the loss of good will, and the loss of its business reputation. Finally, unless Defendants are enjoined, Calvary will suffer present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

92. Calvary has no adequate remedy at law.

## COUNT VI

**(Tortious Interference with Contract – Damages)**
**Calvary vs. Jim Epstein, Evan Epstein and Thor**

93. Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

19

94.     The Epsteins and Thor were aware that Winters was subject to the Agreement when they began working with him in an effort: (i) to make use of the coating technology that was the subject of the Agreement's "Confidential Information" and "Non-Disclosure and Limited Use" provisions, and (ii) to help Winters compete against Calvary in violation of the Agreement's "Post-Agent Restrictions."

95.     The Epsteins and Thor are continuing to interfere with the Agreement by working with Winters to make use of Calvary's confidential and trade secret information and unfairly compete against it despite this knowledge.

96.     The Epsteins and Thor intentionally interfered, and continue to interfere, with Calvary's Agreement with Winters for their own benefit.

97.     The Epsteins and Thor have interfered, and continue to interfere, with Calvary's Agreement with Winters without privilege to do so, and as a result, Calvary will be damaged in an amount to be determined at trial.

98.     The Epsteins' and Thor's conduct was part of an overall scheme and conspiracy, was knowing, intentional, malicious, and reckless, and was of such an aggravated character as to warrant the imposition of punitive damages, costs and attorneys' fees.

## COUNT VII

**(Breach of the Joint Venture Agreement – Injunctive Relief)**
**Calvary vs. Thor**

99.     Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

100.     Pursuant to the Joint Venture Agreement, Calvary and Thor agreed to work together to develop, test, validate, market, and sell the coating technology, and further agreed to share, on an equal basis, both the costs and expenses of the venture and the profits.

101.     Calvary has lived up to all of its contractual obligations in the Joint Venture

Agreement.

102.    Thor has breached the Joint Venture Agreement by, among other things, engaging in efforts to sell or license the coating technology to the exclusion of Calvary, falsely claiming that the coating technology, which is intellectual property owned by Calvary, actually belongs to them, and otherwise attempting to exclude Calvary from the financial benefits of the Joint Venture Agreement to which Defendants agreed.

103.    Unless Thor is enjoined from further violating the provisions of the Joint Venture Agreement, Calvary will be irreparably harmed by the disclosure and use of its chemical formulas, including the formulas comprising the coating technology, which are confidential and trade secret information and solely the property of Calvary. Calvary further will be harmed by the loss of confidence and trust of its customers, the loss of good will, and the loss of its business reputation. Finally, unless Thor is enjoined from further violating the provisions of the Joint Venture Agreement, Calvary will suffer present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

104.    Calvary has no adequate remedy at law.

## COUNT VIII

### (Breach of the Joint Venture Agreement -- Damages)
### Calvary vs. Thor

105.    Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

106.    Calvary has lived up to all of its contractual obligations in the Agent Agreement.

107.    Thor has violated and is continuing to violate the Joint Venture Agreement as described above.

108.    As a direct and proximate result of Thor's unlawful conduct, it is liable to Calvary in an amount to be determined at trial.

21

## COUNT IX

**(Conversion – Injunctive Relief)**
**Calvary vs. All Defendants**

109.    Calvary realleges the foregoing paragraphs as if fully rewritten herein.

110.    By their conduct, as described above, Defendants wrongfully committed, and are continuing to commit, an act, or acts, of dominion over Calvary's intellectual property, denying and threatening to deny Calvary its rights to it.

111.    Unless Defendants are enjoined from further actions to convert Calvary's intellectual property for their own benefit and to the exclusion of Calvary, Calvary will be irreparably harmed by the loss of its intellectual property, including its chemical formulas, including the formulas comprising the coating technology, which are confidential and trade secret information and solely the property of Calvary.  Calvary further will be harmed by the loss of confidence and trust of its customers, the loss of good will, and the loss of its business reputation. Finally, unless Defendants are enjoined from further acts to convert Calvary's intellectual property, Calvary will suffer present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

112.    Calvary has no adequate remedy at law.

## COUNT X

**(Conversion – Damages)**
**Calvary vs. All Defendants**

113.    Calvary realleges the foregoing paragraphs as if fully rewritten herein.

114.    By their conduct, as described above, Defendants wrongfully committed, and are continuing to commit, an act, or acts, of dominion over Calvary's intellectual property, denying and threatening to deny Calvary its rights to it.

115.    Defendants' conduct was knowing, intentional, malicious, and reckless, and was of such an aggravated character as to warrant the imposition of punitive damages, costs and attorneys' fees.

116.    As a direct and proximate result of Thor's unlawful conduct, it is liable to Calvary in an amount to be determined at trial.

## COUNT XI

**(Civil Conspiracy – Damages)**
**Calvary vs. All Defendants**

117.    Calvary realleges the foregoing paragraphs as if fully rewritten herein.

118.    By their conduct, as described above, Defendants entered into a malicious combination to injure others in a way not possible for any of them to have accomplished alone. Among other things, Defendants combined to unlawfully misappropriate Calvary's trade secrets and intellectual property, breach and tortiously interfere with the Agent Agreement and the Joint Venture Agreement, and convert Calvary's trade secrets and intellectual property for their own use.

119.    Defendants' conduct was knowing, intentional, malicious, and reckless, and was of such an aggravated character as to warrant the imposition of punitive damages, costs and attorneys' fees.

120.    As a direct and proximate result of Thor's unlawful conduct, it is liable to Calvary in an amount to be determined at trial.

## COUNT XII
**(Unjust Enrichment)**
**Calvary vs. All Defendants**

121.    Calvary re-alleges the foregoing paragraphs as if fully rewritten herein.

122.    Calvary provided a benefit to Defendants when it expended substantial resources

in the form of capital expenditures, time, labor and other financial resources on the research and development of confidential, trade secret information, including but not limited to the chemical formulas and processes used in developing the coating technology.

123.     It would be unjust for Defendants to retain the benefits they obtained from Calvary without compensating Calvary for those benefits.

124.     The value of the benefits provided by Calvary to Defendants are in an amount to be determined at trial.

<u>**COUNT XIIII**</u>

**(Declaratory Judgment)**
**Calvary v. All Defendants**

125.     Calvary realleges the foregoing paragraphs as if fully rewritten herein.

126.     Ohio law, including Ohio Revised Code Chapter 2721, permits any party to bring to this Court a real and justiciable controversy for adjudication.

127.     Indeed, a real and immediate justiciable controversy exists and has arisen as to who invented and who owns the technology or technologies at issue in this matter.

128.     As alleged above, Defendants have alleged the coating technology/technologies at issue are not Calvary's.   For example, Thor has sought, via applications (specifically, US63/152,533, US17/677,939 and PCT/US22/17569 (hereafter collectively, the "Thor Patent Applications") patents relating to the coating technology/ies at issue.  These applications seek to confirm Thor as owner and Winter as "inventor" despite the fact that the technology/technologies are Calvary's and that Mr. Berger should at minimum also be credited as "inventor" of the same.

129.     Given the facts and circumstances as pled above, pursuant to Ohio law, including Ohio Revised Code Chapter 2721, Calvary is entitled to a judgment declaring it as the owner of the coating technology/ies with Mr. Berger as an inventor.

**WHEREFORE**, Plaintiff Calvary Industries, Inc. demands judgment against Defendants Jonathan Winters, Evan Epstein, Jim Epstein and Thor Custom Steel Coatings, LLC as follows:

(a) Enter a Preliminary Injunction enjoining and restraining Defendants, as well as all persons acting in concert with them, from directly or indirectly selling, using, disclosing, copying, or transmitting Calvary's confidential or trade secret information, including but not limited to the coating technology, for any purpose (including, without limitation, engaging in competition with Calvary);

(b) Enter a Preliminary Injunction requiring Winters to abide by the terms of the Agent Agreement described above and immediately enjoin Winters, and all persons acting in concert with him, from directly or indirectly engaging in competition with Calvary, including but not limited to enjoining Winters from continuing to provide any services to Thor for the purpose of using any coating technology developed by, or in conjunction with, Calvary;

(c) Enter an Order (i) requiring that Thor's amend its patent applications, US63/152,533, US17/677,939 and PCT/US22/17569 (collectively, the "Thor Patent Applications") to accurately reflect that Chris Berger's a named inventor, (ii) declaring that Calvary is the true and lawful owner of the Thor Patent Applications and their underlying subject matter, and (iii) declaring that Calvary is the true and lawful owner of the technology/ies described in the above complaint;

(d) That all other current purported owners of the Thor Patent Applications be ordered to execute the appropriate documents to assign and effectuate Calvary's ownership interest in the Thor Patent Applications;

(e)  That Defendants be enjoined from purporting to assign any sole ownership interest in the Thor Patent Applications contrary to Calvary's ownership interest in the Thor Patent Applications;

(f) Require Winters, and all persons acting in concert with him, to return to Calvary within twenty-four (24) hours of the Court's order all originals, copies, or other reproductions in any form whatsoever of any record or document containing, in whole or in part, any confidential information belonging to Calvary, and to return to Calvary any samples of the coating technology; and

(g) Require that Winters, Evan Epstein and Jim Epstein preserve, not tamper with or modify in any way: the hard drive(s) of their personal computer(s) or other computers they have used since June 1, 2020, and produce the hard drive(s) of their personal computers or any other computers they have used since June 1, 2020, and to produce all portable hard drives, USB devices and thumb drives they have used since June 1, 2020 to Calvary within twenty-four (24) hours of the Court's Order;

(h) Award Calvary actual damages incurred as a result of:

(i) Winters' breaches of the Agent Agreement,

(ii) Defendants' breaches of the Joint Venture Agreement,

(iii) Jim Epstein's, Evan Epstein's and Thor's tortious interference with the Agent Agreement,

(iv) Defendants' breach of the Joint Venture Agreement;

(v) Defendants' conversion of the coating technology and its other intellectual property, and

(vi)    the Defendants being unjustly enriched at Calvary's expense.

(i) With respect to Counts III, IV, and VI, award Calvary actual damages incurred

26

as a result of Defendants' misappropriation of Calvary's trade secrets, as well as punitive damages and Calvary's reasonable costs and attorneys' fees;

(j) With respect to all Counts, award Calvary all costs and expenses associated with this action, including its reasonable attorneys' fees, as well as pre-and post-judgment interest; and

(k) Award Calvary such other and further relief, whether in law or in equity, as the Court deems just and equitable.

Respectfully submitted,

/s/ Theodore C. Copetas
Theodore C. Copetas (0068419)
David A. Eberly (0067007)
Eberly McMahon Copetas LLC
2245 Gilbert Ave. Suite 101
Cincinnati, OH   45206
513-533-1103
513-533-3554 Fax
tcopetas@emclawyers.com
deberly@emclawyers.com

*Counsel for Plaintiff Calvary Industries, Inc.*

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

/s/ Theodore C. Copetas

## **VERIFICATION**

I have reviewed the Complaint. Regarding the allegations of which I have personal knowledge, I know or believe them to be true. Regarding the allegations of which I do not have personal knowledge, I believe them to be true based on company information, documents or both. I declare that, under the penalty of perjury that the foregoing is true and correct. Executed on this 29th day of December, 2022.

_____
Chris Berger



## AGENT AGREEMENT - CALVARY INDUSTRIES, INC.

*This Agent Agreement* is made by and entered into between ("You" or "Recipient") and Calvary Industries, Inc., an Ohio Corporation with its principal office in Fairfield, Ohio, ("Calvary").

### Purpose

You are entering into a business relationship with Calvary Industries, Inc as a Product Developer and Technical Representative. You will be enabled to obtain confidential information about Calvary's business, the business of Calvary affiliates and subsidiaries, prospective customers, customers, consultants, licensors, licensees, and other business associates (hereafter collectively "Third Parties");

### Agent Requirements

In consideration of your Agent status with Calvary, and payment of compensation by Calvary, and in view of your trusted position with Calvary, Calvary and you agree:

1.      **Exclusive Loyalty to Calvary**.  While an Agent for Calvary, you shall devote all your professional time and attention exclusively to the interests of Calvary, and shall perform such services for Calvary.  You will not engage in other employment or representation without Calvary's prior written consent.  You will be loyal to Calvary and will disclose to Calvary all corporate opportunities known to you.  You will promptly disclose to Calvary any conflict of interest or employment matter, which may be adverse to Calvary's interest.

2.      **Confidential Information**.  You do not acquire any right, title, or interest in or the use of Confidential Information in any manner whatsoever.  You shall not, by yourself or through another person or through another entity, during or after you're Agent employment by Calvary, disclose to others, or use, except for Calvary's benefit, any Confidential Information.  Confidential Information means, but is not limited to, any reports, data, charts, graphs, production records, summaries, recommendation, drawings, software or specifications, inventions, trade secrets, discoveries, improvements, marketing plans, business strategies, sales and service manuals, research and technology developments, machines, devices, processes, products, designs, projects, mixtures and/or compounds, whether patentable or not, that may have been, are now, or may hereafter be made, used, devised, considered or investigated by or for Calvary or Third Parties.

Confidential Information also includes, but is not limited to, customer and prospective customer lists, customer product needs and pricing information, service techniques, information which gives Calvary a competitive advantage, financial information, product formulations, computer software owned by Calvary or licensed by Calvary from Third Parties, computer data, company passwords, computer hardware and other information concerning the processes, products and activities of Calvary and Third Parties.

3.      **Non-Disclosure and Limited Use**.    You will at all times keep secret and hold inviolate Confidential Information.  The obligations of this section shall not apply if and to the extent, any Confidential Information is or becomes generally known and is available for use by the public except by an act or an omission of you or another employee with a duty to keep it confidential.  You shall not disclose any identity or correlation between matters publicly known and Calvary's Confidential Information.  Further, you shall not, without the written consent of Calvary:

   a) provide unauthorized disclosure to others, including Calvary employees and their families (except those individuals specifically identified as having a demonstrable "need to know" and who personally acknowledges in writing the obligations of this Agreement);
   b) use the Confidential Information for your own benefit or the benefit of others, in any manner detrimental to Calvary, or otherwise than for its intended use, or disclose to others that the Confidential Information is known to or used by the Recipient;

   c) make unauthorized copies or retain any work product or document relating to or in any manner based on Calvary's <u>Confidential Information</u>, (and you shall turn over all such work product to Calvary upon termination of this Agreement, your Agent status, completion of services or demand by Calvary, whichever first occurs).

# EXHIBIT A

4.  **Calvary's Property To Be Used Exclusively For Calvary's Benefit.** Calvary's property includes, but is not limited to, identification cards, cars, computer hardware and software, keys, office equipment, books, laboratory notes, credit cards, sales and service manuals, training manuals, treatment and technology manuals made by or coming into your possession while working for Calvary. All Calvary property shall be returned to Calvary upon termination of your employment or on request of Calvary at any other time.

Except in the proper exercise of your employment duties, you, either during or after your employment, will not duplicate, share, or remove from Calvary's custody, or knowingly allow any other person to duplicate, share or remove from Calvary's custody, any Calvary Confidential Information, Calvary Property, or any information which has not been publicly disclosed.

Personal electronic devices must be scrubbed of Calvary confidential information upon termination or upon request of Calvary at any other time.

5.  **Employment and Post-Agent Restrictions.**
During and for eighteen (18) months immediately following termination of your Agent status, you will not, by yourself or through another person or through another entity:

   a)  Solicit, offer to sell, or sell any products or provide any services, which compete with or displace Calvary's products or services to those customers who were provided Calvary products or services at any time during the (18) months preceding termination of your employment at Calvary or its affiliates and;

   b)  Solicit, support, offer to sell, or sell any products or displace Calvary's products or services to those customers and their branches, plants and offices, which you called on, supported, contacted, were introduced to, or performed services for eighteen (18) months preceding termination of your Agent status with Calvary or its affiliates; and

   c)  Employ, solicit, or endeavor to entice away from Calvary (whether for your own benefit or on behalf of another person or entity) any employees of Calvary to leave the employ of Calvary or to work for any competitor of Calvary, nor will you otherwise attempt to interfere (to Calvary's detriment), in the relationship between Calvary and any such employees.

   d)  You further acknowledge that Calvary has customers and representatives in regional territories across North America, and that Calvary may from time to time modify and/or expand the territories in which it transacts business.

   e)  If any part of this Agreement is deemed by a court or other tribunal to be unenforceable or unreasonable as to scope, activity, territory, duration, or in any other respect, then (i) such finding shall not affect any other provisions of this Agreement, which shall otherwise remain in full force and effect, and (ii) such court or other tribunal may either (a) modify the scope, activity, territory, duration or other aspect of it to such extent as the court or tribunal shall deem necessary to render it reasonable and enforceable, or (b) enforce it partially, to effect a lesser restriction as the court or tribunal shall deem reasonable.

   f)  You acknowledge that the restrictions contained within the agreement are reasonable, both as to duration and your territory (as defined in Exhibit B), to protect the Company's legitimate business interests.

6.  **Employment-At-Will.** This Agreement and its terms are applicable from the date your Agent status with Calvary began. This Agreement does not create or provide for any period of Agent status by Calvary. Your Agent status shall be at-will and you can be terminated with or without cause, and with or without notice, at any time by you or Calvary.

7.  **Payroll and Debt Adjustments.** You authorize Calvary to withhold or offset from any money or commissions owed to you, all debts or obligations you owe to Calvary by payroll deduction or otherwise when your Agent status is terminated.

8.  **Affiliates.** References to affiliates mean corporations, domestic or foreign, more than twenty-five per cent (25%) of whose voting stock is owned directly or indirectly by Calvary.

9.  **Conditions of Agent Employment and Pay.** see exhibit A

2 of 5

10.   **Copyrights**.  You hereby assign to Calvary the copyright in all works prepared by you which are either:

  a)   within the scope of your employment; or,

  b)   based upon information acquired from Calvary not normally made available to the public; or

  c)   commissioned by Calvary but not within your scope of employment.

11.   **Survival of Obligations**.  The covenants, agreements and restrictions undertaken by or imposed on you in this Agreement, which are stated to exist or continue after termination of your Agent status with Calvary shall exist and continue irrespective of the method or circumstances of such termination.

12.   **Award of Fees Against You**.  You acknowledge and agree that, in the event of a breach or threatened breach of any one or more of the provisions in paragraph 5 (a -h), of this Agreement, there will be no adequate remedy at law for Calvary and that Calvary will be entitled to injunctive relief, in addition to, and without waiving, any and all other rights and remedies available to Calvary under this Agreement or otherwise

13.   **Notice of Post-Agent Restrictions**.  Becoming an Agent with Calvary is contingent upon the signing of this Agreement.  You acknowledge you were informed you would be required to sign this Agent Agreement containing post termination restrictions, such as the non-solicitation of customers restriction, before you were offered or accepted Agent position by Calvary and/or that you have received benefit by signing this agreement post-Agent status.

14.   **Assignment by Calvary**.  This Agreement shall inure to the benefit of the successors and assigns of Calvary. Insofar as the same may be applied thereto, the terms and provisions hereof shall apply to and bind your heirs, legal representatives and assigns.  This Agreement may be assigned by Calvary without your consent or knowledge.  If you are employed by a Calvary affiliate, subsidiary, joint venture or partnership entity (collectively hereafter "Successor") Calvary may assign this Agreement to the Successor and this Agreement shall be binding on you and Successor as if they had entered into a separate Employment Agreement when you are hired by such Successor. The Successor shall succeed to all rights in this Agreement, including this right of assignment.  You cannot assign your rights in this Agreement.

15.   **Insurance Requirements**   By signing this Agreement, the Agent acknowledges and agrees that he has obtained all workers' compensation and liability insurance required by state law, for himself and all individuals employed by him. The Agent further agrees that he will maintain such insurance for the life of this Agreement.  A copy of the insurance policy is required upon confirmation of Agreement.

16.   **Choice of Law and Forum**. This Agreement shall be interpreted, construed and established according to the laws of the State of Ohio and any suit brought to enforce this Agreement or related to this Agreement shall be brought in the courts of Butler or Hamilton Counties, Ohio.  All prior representations and agreements are merged herein and superseded hereby.  It is the intention of the parties that any Confidential Information disclosed prior to the date of this Agreement shall be governed hereby.

17.   This **Agreement** comprises the entire **agreement** between the Agent and Calvary and shall **supersede** all prior agreements, oral and written declarations of intent and **other** legal arrangements (whether binding or non-binding) made by the Parties in respect thereof.

I have read, understand, and have voluntarily signed this Agreement.

_Jonathan ole Winters_
Printed Name

_(signature)_
Signature

_02/09/2018_
Date of Signature

3 of 5

Calvary Industries, Inc.

CHRIS BERGER
---
Printed Name

---
Signature

9 OCT 2018
---
Date of Signature

EXHIBIT A

1. Prior to first Agent Draw or Payout, Jon Winters will submit to Calvary a complete list of prospects, contacts, customers, phone numbers, emails.
2. Prior to first Agent Draw or Payout, Jon Winters will secure a significant order from BullMoose or other credible customer, prepaid, for testing and/or production.

3. Payout to Jon will be either in the form of Draw against future Gross Profit (GP) at the rate of $ 5,000.00 per month, or payment of Gross Profit on sold/shipped/paid product at the rate of:
A) 50% of GP less freight for two years, then moving to 31% if Winters is taking total care of the account.
B) 31% of GP for Calvary products Winters sells; if one of Calvary Reps. sells Calvary chemicals to one of Winters' provided connections, Winters' share will be 10% of GP for one year.
C) It is agreed that Calvary will have final say regarding what is acceptable minimum margin for business sales, case-by-case.
D) Winters asserts and signs that he has no other agreement(s) with any person or business that would restrict him in from conducting business with us, or require permissions, payment of royalties, licenses, loans, etc. to any 3rd party.

I have read, understand, and have voluntarily signed this Addendum

_Jonathan J2 Winters_
Printed Name

_(signature)_
Signature

_10/09/2019_
Date of Signature

For Calvary Industries, Inc.

By: _(signature)_

Title: ~~CEO~~ VICE-PRESIDENT

Date: _9 OCT 2018_

Agent; 2018doc

5 of 5

I, Jonathan K Winters, hereby instruct Calvary Industries, Inc. to pay all draws and commissions due me to One Source Energy Group, 2217 Langdon Farm Rd, Cincinnati, OH 45237, Employer ID Number 45-4964566.

_____
Signed

_____
Print Name

_____
Date

_____
Notary

_____
Date

LIZ CLARKE
Notary Public, State of Ohio
My Commission Expires
May 17, 2022